**E-FILED**
Monday, 03 August, 2015  09:43:37 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| PAUL E. KINCAID, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 09-CV-3053 |
| | ) | |
| SANGAMON COUNTY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

This order rules on the pending motions, to ready this case for the trial this September.

## I.     Renewed Summary Judgment Motions

On March 10, 2014, Judge Myerscough denied summary judgment to Defendants.  Judge Myerscough then recruited pro bono counsel for Plaintiff and permitted discovery to be reopened and renewed dispositive motions to be filed.  This Court took over the case last May, on the parties' consent, and a trial is scheduled for September 14, 2015.

Before the Court are renewed motions for summary judgment by four of the defendants:  former U.S. Marshal Jeff Cowdrey, Nurses Ramsey and Brauer, and former Sangamon County Sheriff Neil Williamson.  The Court assumes familiarity with Judge Myerscough's order denying summary judgment.

After a careful review, the Court reaches the same conclusion as Judge Myerscough with regard to Marshal Cowdrey, Nurse Brauer and Nurse Ramsey.  While a jury certainly could find in favor of these defendants, material factual disputes still exist which preclude summary judgment.  No additional evidence submitted with the renewed summary judgment motions compels a different conclusion.  In short, if Plaintiff and his witnesses are believed, Plaintiff was so seriously ill that even a layperson would have known that his medical care was so severely lacking that something needed to be done.  Each of these defendants were sufficiently connected to the events that their personal knowledge can be inferred as well as their ability to take action.  The gravity of Plaintiff's condition and the extent of each of these defendants' knowledge are simply not decisions that can be made on paper.

The Court reaches a different conclusion for former Sheriff Neil Williamson.  Sheriff Williamson testified in his deposition, taken after summary judgment was denied, that he did not even know what Plaintiff looked like and was not made aware of any complaints about Plaintiff's health until a week before Williamson's deposition.  (Williamson Dep. p. 26.)  Plaintiff has no competent evidence to dispute this.  Accordingly, summary judgment will be granted to Sheriff Williamson.

The Court further details below its reasoning with regard to each Defendant who filed a renewed motion for summary judgment.

### A.  Former U.S. Marshal Jeff Cowdrey

Plaintiff's case against Defendant Cowdrey will be difficult to prove because of the "presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials . . . ." Hayes v. Snyder, 546 F.3d 516, 527 (7th Cir. 2008)(summary judgment appropriate where nonmedical defendants promptly investigated complaints and relied on physicians).  "'The only exception to this rule is that nonmedical officers may be found deliberately indifferent if "they have a reason to believe (or actual knowledge) that prison doctors or their

assistants are mistreating (or not treating) a prisoner.""" McGee v. Adams, 721 F.3d 474, 482 (7th Cir. 2013)(quoted cites omitted). Plaintiff does not dispute that, in response to Jon Noll's letter of concern regarding Plaintiff's declining health, Defendant Cowdrey called the Jail on April 3, 2007, and spoke to a licensed practical nurse, Nurse Nicey.  According to Cowdrey's notes from that conversation, Cowdrey understood that Dr. Maurer had examined Plaintiff the day before, prescribed an antibiotic, and noted no temperature.  The notes also reflect that Cowdrey understood that Dr. Maurer would see Plaintiff again on December 9.  Whether Nurse Nicey actually examined Plaintiff that day or any other day is not in the record.

Judge Myerscough recognized these facts but still found that "an inference arises from Plaintiff's evidence that Defendant Cowdrey knew about Plaintiff's deterioration in early April, 2007, had the authority to intervene, and unreasonably relied on the nurse's assessment of Plaintiff's condition." (d/e 165, p. 11.)  This Court agrees.

Part of the new evidence offered by Cowdrey is that Plaintiff's own expert opined that Plaintiff's medical care was acceptable from

March 31 to April 4, 2007.  (Dr. Giffin Dep. p. 122, l. 21-24, d/e 282-1.)  However, the Court agrees with Judge Myerscough that a juror could find that Cowdrey learned after April 4 that Plaintiff was fast declining and urgently needed medical care.  Plaintiff's friend, Steve Collins, says he left such a message for Cowdrey through the Marshal's answering service on the evening of April 5th.  Even with Cowdrey's express denial of having received the message, an inference arises that Cowdrey would have received the message in the usual course of business, as Judge Myerscough already concluded.  (The Court does not rely on the unauthenticated memo and letter offered by Plaintiff in support of that conclusion; the Court agrees that these documents are not properly authenticated, are without foundation, and contain hearsay.)  A reasonable juror might conclude that Cowdrey knew that Plaintiff was at a substantial risk of serious harm which Cowdrey could have confirmed by visiting Plaintiff at the Jail and simply looking at Plaintiff.  Under the contract between the U.S. Marshal and the Jail, Cowdrey arguably had the power to authorize that Plaintiff be taken for an outside consult before Plaintiff's condition became emergent. (Intergovernmental Agreement, p. 3, de 282-1.)  Cowdrey also could

have asked to speak to the treating physician, rather than rely solely on the nurse's account. In short, reasonable juror could conclude that Cowdrey turned a blind eye to Plaintiff's plight and unreasonably relied on Nurse Nicey, as Judge Myerscough already concluded. *See also* <u>Perez v. Fenoglio</u>, --- F.3d ---, 2015 WL 4092294 (7th Cir. 2015)(that a prisoner is receiving medical care does not preclude inference of deliberate indifference where prison official knows of and disregards a substantial risk of serious harm).

Cowdrey argues that even if he had received Collins' message and had contacted the Jail again, he would have only learned, again, that the medical staff were aware of Plaintiff's condition and were treating Plaintiff. It is true that Dr. Maurer saw Plaintiff on April 4 and ordered blood tests, a urinalysis, and x-rays. Yet, the crux of Plaintiff's case against the nonmedical defendants is that even a layperson would have known that Plaintiff was at a substantial risk of serious harm and that the medical treatment he was receiving was woefully inadequate. As Judge Myerscough recounted the events during this time period:

> Plaintiff describes himself as "in an emaciated state, in complete medical distress," with severe dehydration and throat pain and an inability to eat or drink. (Pl.'s Aff. ¶

> 39.) Plaintiff's sister, Judy Cooke, and a nearby cellmate of Plaintiff's, Stephen Puckett, offer their own affidavits to corroborate Plaintiff's own account of his severe and obvious deterioration during this time. Judy Cooke avers that Plaintiff looked like a "dead man walking" when she visited him—that "anyone who would have seen Paul on that day would have to be blind not to see a man in crisis and total distress." (Cooke Aff. ¶ 6, 11.) Stephen Puckett avers that he personally witnessed Plaintiff's physical deterioration day after day and was so alarmed that he called Steve Collins because he feared Plaintiff was going to die. (Puckett Aff. ¶ 9.)

(d/e 165, p. 6-7.)  Ms. Cooke also averred that she observed that Plaintiff's condition had gone from bad to worse between her visit on April 2 and her visit on April 9:  "[F]rom a Monday to a Monday, 7 days, Paul had gone from death's door to death warmed over." (Cooke Aff. para. 11, d/e 137.)  Stephen Puckett averred that "[a]nyone who would have come in contact with Paul during this period and seen him for even the briefest of time would have known that Paul was in great distress and needed serious help from a hospital.  Anyone would have smelled the sickness on Paul." (Puckett Aff. para 8, d/e 137).

Crediting this testimony, a juror could reasonably conclude that the nonmedical defendants who were aware of Plaintiff's condition during this time were deliberately indifferent, even though

Plaintiff was being seen by Dr. Maurer.  Mr. Noll's letter and Stephen Collins' phone message allow an inference that Defendant Cowdrey had this awareness.

Therefore, neither summary judgment nor qualified immunity is warranted for Defendant Cowdrey.  Defendant Cowdrey's qualified immunity argument depends on his argument that he reasonably relied on Nurse Nicey's assessment and heard no further complaints until Plaintiff's hospitalization.  However, for the reasons discussed above, those facts are disputed.  When the facts are construed in Plaintiff's favor, an inference arises that Cowdrey consciously disregarded a serious risk of substantial harm to Plaintiff.

### Nurses Brauer and Ramsey

Nurses Brauer and Ramsey argue that the evidence shows that they were only minimally involved with Plaintiff's care, that Plaintiff was under the continuous care of Dr. Maurer, and that they reasonably relied on Dr. Maurer's professional judgment.  A rational juror could certainly agree.  However, crediting Plaintiff's version, Nurse Brauer was dismissive of Plaintiff's substantial and continuing weight loss, which, according to Plaintiff, was

involuntary and indicated an underlying serious medical problem.[1]

Additionally, Plaintiff's evidence allows a reasonable inference that

Nurse Brauer and Nurse Ramsey were both personally aware for

months of Plaintiff's continued difficulties with vomiting, weight

loss, and nausea, and, Plaintiff's alarming decline in April (if

Plaintiff's witnesses are believed).  As Judge Myerscough reasoned

in her summary judgment order:

> A reasonable jury could also find that Nurses Brauer and
> Ramsey were deliberately indifferent to Plaintiff's plight.
> Nurses are generally expected to defer to the physician's
> judgment, but that deference "may not be blind or
> unthinking, particularly if it is apparent that the
> physician's order will likely harm the patient."  Berry v.
> Peterman, 604 F.3d 435, 443 (7th Cir.2010).  If Plaintiff's
> version is believed, a reasonable jury could find that the
> nurses turned a blind eye to Dr. Maurer's obviously
> deficient treatment.

(3/10/14 summary judgment order, p. 9, d/e 165); *see also*

Perez, 2015 WL 4092294 at *6-7 ("While nurses may generally

defer to instructions given by physicians, they have an

independent duty to ensure that inmates receive

constitutionally adequate care.")(discussing Berry); Holloway v.

Delaware County Sheriff, 700 F.3d 1063, 1075 (7th Cir.

---

[1] Defendants have evidence that Plaintiff at times reported to others that his weight loss was voluntary, but that is an issue for impeachment.  The Court cannot decide credibility.

2012)("Nurse can be deliberately indifferent if she 'ignore[s] obvious risks to an inmate's health' in following physicians orders.")(quoted cited omitted).  The evidence allows a reasonable inference that Plaintiff suffered from a serious medical condition for months, ending in his emergency hospitalization in April.

Additionally, as Plaintiff points out, "there is a vast discrepancy between what is reflected in the medical records and the accounts provided by Mr. Kincaid and other non-governmental witnesses as to his communications with Defendants, as well as his obvious symptoms."  (Pl.'s Resp. p. 19, d/e 20.)  These discrepancies are factual disputes which belong to the jury to resolve.

### *Former Sheriff Williamson*

Sheriff Williamson is being sued in his individual capacity, which means that Plaintiff must have evidence for a reasonable juror to find that Williamson knew that Plaintiff needed medical care.  Matthews v. City of East St. Louis, 675 F.3d 703, 708 (7th Cir. 2012)("To show personal involvement, the supervisor must 'know about the conduct and facilitate it, approve it, condone it, or turn a

blind eye for fear of what they might see.'")(quoting <u>Jones v. City of Chicago</u>, 856 F.2d 985, 992–93 (7th Cir.1988).

After summary judgment was denied and discovery was reopened, Sheriff Williamson was deposed.  He testified in his deposition that that he was not made aware of any complaints or requests for medical care by Plaintiff or Plaintiff's family or friends.  Williamson testified that he first learned of this the Friday before his deposition.  Williamson also testified that he had not spoken with Marshal Cowdrey about Plaintiff before this lawsuit.  (Williamson Dep. pp. 21, 48.)  Williamson could not recall if he had talked to Jon Noll about Plaintiff during Plaintiff's incarceration, <u>id.</u> p. 27, 48, but Plaintiff does not assert that Noll or anyone else contacted Sheriff Williamson during the relevant time period.

Plaintiff argues that Sheriff Williamson's knowledge can be inferred from the many complaints made throughout Plaintiff's detention at the Jail by Plaintiff, his family, his friends, and his defense attorney.  However, Plaintiff has no evidence that anyone actually relayed those complaints to Sheriff Williamson.  Further, Williamson was not on-site or in

charge of daily jail administration like the other Sangamon County Defendants were.  Nor was Sheriff Williamson personally contacted about Plaintiff like Defendant Cowdrey was.

To hold Sheriff Williamson liable on this record would be to allow an inference of deliberate indifference solely because Williamson is the Sheriff.  That would amount to respondeat superior liability, which is not available for constitutional claims.  Miller v. Harbaugh, 698 F.3d 956, 960 (7th Cir. 2012)("there is no vicarious liability under Section 1983 . . .") That other "high ranking officials" (Pl.'s Resp.  cite) at the Jail knew about Plaintiff's condition is not enough, by itself, to conclude the information was communicated to Williamson, much less that Williamson condoned or was somehow personally involved in the denial of adequate medical care.

## II.  Motions to Strike Supplemental Disclosures

Defendants move to strike Plaintiff's supplemental expert disclosures which Plaintiff mailed to the parties on or around April 30, 2015, the close of discovery.  There is no dispute that Plaintiff's expert disclosure deadline was October 29, 2014, and the

deposition of Plaintiff's expert was taken on December 30, 2015. The depositions of Defendants' experts were taken on February 23, February 27, and March 6, 2015, which would set the deadline for rebuttal of the expert deposition testimony near the end of March or the beginning of April.

If these disclosures are truly supplemental, then the disclosures are not untimely Fed. R. Civ. P. 26(e)(2), which sets the same deadline as pretrial disclosures under Rule 26(a)(3)—30 days before the trial.

Defendants argue that the supplemental disclosures are not supplemental, but rather new opinions not previously disclosed. Plaintiff does not appear to disagree, instead arguing that the supplemental opinions are in rebuttal to the expert reports and depositions of Defendants' experts.  Plaintiff concedes that the rebuttal opinions were provided three to four weeks late because he improperly relied on the April 30 deadline for the close of discovery, rather than the deadline for rebuttal opinions in Rule 26(a)(2)(D). Plaintiff asks for leave to file the rebuttal opinions late, consistent "with the courtesies offered by Plaintiff" to Defendants over deadlines in the past.  He also offers to allow a supplemental

deposition of his expert, Dr. Giffin, by phone to reduce Defendants'

costs, but objects to the costs of the deposition being shifted to him.

The Court has reviewed the additional expert disclosures, and

statements 1, 5, or 6 do not appear to be expert opinions at all or

even supplemental information.  These are statements about what

the medical records show or do not show, not expert opinions.  The

records show what they show, and Dr. Giffin can testify about what

the records say or do not say.  The Court will not strike disclosures

1, 5, and 6.

Additional disclosures 2 and 3 appear to be making the point

that Plaintiff's complaint of chest pain in December 2006 was or

could have been a symptom of Plaintiff's gallbladder disease.  This

is a new opinion.  Dr. Giffin's original opinion did criticize the

handling of Plaintiff's complaints of chest pain and dizziness in

December of 2006, but Dr. Giffin did not link those complaints to

possible gallbladder disease.  (Dr. Giffin's original report, para. 1,

d/e 274-2 p. 6.)[2]  Dr. Giffin's original opinion attributes Plaintiff's

other symptoms—weight loss, nausea, vomiting, difficulty

---

[2] The original report appears to be missing the first  page.

swallowing, food intolerances, and abdominal discomfort—to underlying gallbladder disease.  Id. paras. 2, 4, 6.

However, disclosures 2 and 3 are fairly characterized as rebuttal opinions to the opinion of Defendant's expert, Dr. Peckler, that Plaintiff did not complain of right upper abdomen pain until April 11, 2007.  (Dr. Peckler's report, 278-3, p. 1.)  Disclosures 2 and 3 seem to counter that gall bladder pain can masquerade as heart pain.

Disclosures 2 and 3, even as rebuttal opinions, are late, but they cause no significant prejudice or surprise to Defendants. According to Nurse Moore (Defendants' expert), Dr. Maurer already testified in his deposition that chest tightness and dizziness can be symptoms of gallbladder disease.  (Moore Report, para. 4, d/e 278-1.)  Dr. Peckler (defense expert) also stated that Plaintiff "complained of chest pain and/or stomach pain" in April, which, in Dr. Peckler's opinion, was consistent with acute cholecystitis. (Peckler Letter, second para. d/e 278-3.)  Thus, Plaintiff could get this information admitted even without Dr. Giffin's testimony. Disclosures 2 and 3 will not be stricken.

Disclosure 4—that patients with cardiac problems should be told to report further symptoms, and that this instruction should be documented—is somewhat supplemental to Dr. Giffin's original opinion that the response to Plaintiff's complaint of chest pain in December of 2006 was substandard.  Disclosure 4 is also arguably in rebuttal to the nurse expert's opinion that only giving Plaintiff an aspirin was appropriate.  Disclosure 4 will not be stricken.

Disclosure 7 states that medical documentation should include a history, physical, positive and negative findings, and instructions to the patient.  Plaintiff does not explain how this statement is in rebuttal.  However, the statement seems already implied in Dr. Giffin's expected testimony about what the records do or do not show.  It is no surprise that Dr. Giffin would testify what the records do not show and what they should show.  It is certainly no surprise that a doctor would opine that medical records should contain a history, physical, findings, and instructions.  Plaintiff could elicit that information from Defendants' experts without any testimony from Dr. Giffin.  The Court will not strike disclosure 7.

The Court reaches a different conclusion on disclosures 8 and 9.  Statement 8—that dizziness can be a symptom of a cardiac

condition—is new, and Plaintiff does not adequately explain how the opinion is in rebuttal to any statements by Defendants' experts. Statement 9 (the symptoms and causes of angina) is also new and is not offered in rebuttal.  Further, the point and relevance of these disclosures is unclear.  Plaintiff has not adequately explained how these statements are rebuttal opinions or even why they are important to his case.  Therefore, the Court concludes that statements 8 and 9 are new, not supplemental or rebuttal opinions, and that Plaintiff has not established a good reason why the new opinions should be allowed late.  Disclosures 8 and 9 will be stricken.

To ameliorate any prejudice, Defendants may depose Dr. Giffin on the additional disclosures, but costs will not be shifted to Plaintiff.  To ensure that the trial will go in September as scheduled, Defendants may have their experts address disclosures 1-7 on the stand without prior written disclosure of their surrebuttal.

**IT IS ORDERED:**

1)     The renewed motion to strike by Defendants Williamson, et al., is denied (299).  The Court has not relied on inadmissible hearsay in determining that disputed questions of fact exist for the

jury.  Plaintiff's own testimony about his experience and the testimony of his witness's personal observations and actions are the evidence that create disputed material facts.

2)    The motions for summary judgment filed by Defendants Cowdrey, Brauer and Ramsey are denied (279, 281).

3)    The motion for summary judgment filed by Defendant Sheriff Williamson is granted (280).

4)    The motions to strike Plaintiff's supplemental disclosures are granted in part and denied in part (274, 275, 277).  Disclosures 8 and 9 are stricken.  The other additional disclosures are not stricken.

5)    By August 17, 2015, Defendants may take a supplemental deposition of Dr. Giffin regarding his additional opinions.  Defendants shall pay the cost of the supplemental deposition, per Fed. R. Civ. P. 26(b)(4)(E).

6)    The unopposed motions for leave to file amended answers are granted (295, 296, 297).

7)    The motion for sanctions by Defendants' Williamson, et al., is denied (298).  Plaintiff maintains that he did not tell Dr. Szoke that he had voluntarily lost 100 pounds. Dr. Szoke maintains

that Plaintiff did say this and that the statement was accurately recorded in Plaintiff's records.  This is a credibility question, not a grounds for sanctions.

8)    Jury instructions will be circulated in a separate order.

9)    **The clerk is directed to terminate Sheriff Williamson.**

10)   **The clerk is directed to docket the amended answers attached to motions 295, 296, 297.**

ENTER:   August 3, 2015

FOR THE COURT:

**s/Tom Schanzle-Haskins**
TOM SCHANZLE-HASKINS
UNITED STATES DISTRICT JUDGE